508 A.2d 533

**Julian Nance CARSEY**

v.

**Nancy S. CARSEY.**

**No. 1109, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

May 14, 1986.

Sean Daniel Wallace (William C. Brennan, Jr. and Knight, Manzi, Brennan & Ostrom, P.A., on brief), Upper Marlboro, for appellant.

Thomas B. Yewell, Greenbelt, for appellee.

**546**

Argued before ALPERT, BLOOM and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

This appeal from the judgment of the Circuit Court for Charles County stating the ownership interest of the parties[1] in certain real and personal property presents for resolution two issues:

1.  Did the trial court err in finding there to be no "marital property" upon which to base a monetary award, pursuant to Maryland Family Law Code Ann., § 8–201 *et seq.* (the Marital Property Act)?

2.  Was the trial court empowered to order[2] the transfer of all assets to appell[ee]?

We answer the first question in the negative and affirm.

The facts, which are unique, will be briefly set forth in order to bring definition to the issues presented. On May 19, 1982, Julian Nance Carsey, appellant, "chucked it all", leaving the State, his job as president of the Charles County Community College, his home, and his wife of fourteen years, Nancy S. Carsey, appellee, and went traveling in the Southwest and Mexico, eventually settling in El Paso, Texas. He took with him virtually all of the parties' liquid resources, including the parties' joint income tax refund check and appellee's retirement account and a check payable to appellee for part-time work she had performed, all of which he endorsed with appellee's name. He did leave appellee two notes and a tape.

The first note, dated May 15, 1982 and addressed, "To Whom It May Concern", read:

---

1.  Md.Family Law Code Ann., § 8–202(a)(1) and (2) requires the court to "resolve any dispute between the parties" with respect to the ownership of real and personal property. Section 8–202(b)(1) permits it to grant a decree stating the ownership interest of each party.

2.  In his brief, appellant, inadvertently we are sure, referred to "appellant" rather than "appellee".

> I hereby irrevocably, and for the future, relinquish all claims to any estate of J.N. & N.S. Carsey. I also disclaim any responsibility for liabilities related to that estate.
>
> This includes cash values of extant life insurance or annuity policies.
>
> All properties assigned jointly or under my name singularly are Nancy S. Carsey's privilege to dispose of as she wishes.

The second note, in addition to informing appellee of the physical and emotional mess he was in, referred her to the tape describing the family's finances. In addition to joint obligations of which appellee presumably was aware, the tape informed her for the first time of the existence of an executive plan [2a] with a balance of between $8000 and $9000 which appellant had with Maryland National Bank and appellant's personal postal loan also in the amount of approximately $9000.00.

Appellee filed a Complaint, in the Circuit Court for Charles County, for divorce a mensa et thoro and for appointment of a trustee for appellant on July 15, 1982. The complaint stated, relevant to the appointment of a trustee:

> [t]he plaintiff believes and therefore avers that if she is not appointed Trustee to act for and in the place of defendant concerning his interest in real estate and personal property, the plaintiff will be effectively barred from actuating the stated intentions of the defendant and will incur serious and irreversible financial loss and hardship.

Appellee apparently pursued and was successful in sorting out the financial situation with which she was left.

Having learned of appellee's pending divorce proceedings, appellant filed a Counter Complaint for Divorce A Vinculo Matrimonii and Division of Marital Property and Other

---

**2a.** A loan with Maryland National Bank.

Relief. The divorce was granted to appellant on no-fault grounds and the division of marital property reserved for further proceedings,[3] at which evidence was presented[4] and both parties were fully heard. Rejecting appellant's argument, the court in its order ruled:

[T]he note did constitute an offer and that offer was accepted by the Plaintiff. This Court further determines that there was insufficient proof of mental incapacity on the part of the defendant at the time of said note, so as to relieve the defendant from obligations of being bound by the terms of the agreement,

It, therefore, ordered:

that there is no "marital property" to be distributed between the parties, and ... that ... Nancy S. Carsey, be and she is hereby declared to be the sole owner of all marital property and, as well, whatever non-marital property ... Julian N. Carsey, left in the State of Maryland at the time of his departure.

Because it found, at least implicitly, that all otherwise marital property had been "excluded by valid agreement," the trial judge did not determine, even though there obviously was a dispute in this regard, "which property is marital property." Md.Family Law Code Ann., § 8–203(a). He did direct counsel for appellant and appellee, as trustees for appellant, to "execute whatever Deeds, documents of

---

**3.** *See* Md.Family Law Code Ann. § 8–203(a)(2).

**4.** Appellant offered testimony from a friend as to his drinking habits. That evidence established that appellant had been observed drinking early in the morning on two occasions. Appellant testified to the pressure he was under at the time he left home; drinking a quart of vodka a day beginning in March 1982 and continuing through April or May 1982; his financial problems; his efforts to rid himself of his alcohol problem; and his activities while away. Expert testimony to the effect that appellant "was in a deranged state of mind; quasisuicidal, state of mind," and "not rational" was also presented.

On the other hand, appellee produced testimony, including her own, that appellant acted normally immediately prior to his disappearance and that either his alcohol intake was not as large as appellant said or that it did not affect his ability to function.

transfer, conveyances, and any and all other instruments to vest in the name of Nancy S. Carsey, alone, all marital property acquired by the parties during their marriage as well as any non-marital property remaining in the State of Maryland at the time of the departure of Julian N. Carsey on May 19, 1982."

## I.

Md.Family Law Code Ann. § 8–201(e)(1) defines marital property as "the property, however titled, acquired by one or both parties during the marriage." It does not include such property that is "excluded by valid agreement." § 8–201(e)(2)(iii).

Astutely assessing the implications of the court's finding of a valid agreement, appellant endeavors to convince us, as he endeavored to convince the court below, that there was no valid agreement. His approach is multifaceted; he asserts that there is no valid agreement because the note: (1) being simply a statement of intention, *Maryland Supreme Corp. v. Blake Co.*, 279 Md. 531, 539, 369 A.2d 1017 (1977), lacked specificity as to its terms, *Strickler Engineering Corp. v. Seminar, Inc.*, 210 Md. 93, 101, 122 A.2d 563 (1956), (2) lacked consideration; and (3) was made by one who was not legally competent to make it.

We will not set aside the lower court's judgment on the evidence, giving due regard to the court's opportunity to judge the credibility of the witnesses, unless clearly erroneous. Md.Rule 1086. The trial court rendered a lengthy and detailed opinion from the bench, the pertinent portion of which is set out below:

Failure of consideration or mutual mistake of fact or fraud in the inducement or some other thing that would enable you to set the contract aside. None of that, none of those extraneous matters appear here. The only two things that are argued, first his mental condition wasn't such to make a contract. And second, that the contract wasn't supported by adequate consideration.

Now, if one looks at this note, which is Plaintiff's exhibit one, the intention of the person preparing that note is abundantly clear. It is much clearer, in fact, than if it had been drawn by an attorney. It is a model of brevity and clarity and exactitude.

It says take the property, take all my debts, it is yours to keep. You really can't do any better than that. Now, if there were nothing but that, however, the argument could be made well, he didn't have any clear idea about what exactly it was he was giving away, all this property, and a little bitty note like that to cover it, why that is not, that is not realistic. The man who has got this kind of property ought to go to Mr. Digges and have a twenty-five page contract, one loophole on each page drawn up, and that way if he wants to get out of it there is no problem.

But when you add to Plaintiff's exhibit number one the transcript of Plaintiff's exhibit number two, you see that he not only had a good idea of what he had, but he also had in mind the balances on accounts, the location of the property. He was trying to say I think I left you with a can of worms. I don't know whether you will be able to do anything with it or not, but here are some of the things you might be able to do which will help you. I don't know that they will, but obviously, he was giving her the benefit of some of the things that he had run through in his mind that he might do to improve the financial position.

His reassurance to her that he had done the taxes correctly and that there weren't any—nobody was going to sandbag her from the tax collector's office. All these things indicate to me that although he had problems and although he may have been drinking more whiskey or booze than he thought he should and although he had determined to do something which most men would find way less than honorable, he still was absolutely clear about what he was doing and about what effect it would have on him and his property and how she would have to

manage it. Not only is this absolute proof that he was sane and competent and knew what he was doing and how it would relate to him, but, also, he had a clear perception of what she had to do to respond to what he was offering her.

Now, faced with that, the vague testimony about his super ego, interesting as it may be, doesn't persuade the Court that he was lacking the mental capacity or the requisite mental condition or ability to make a contract.

Now, I have already observed in these comments that in response to that offer she was in no position to even inform him in writing how she felt about it. The only thing she could do, faced with the day-to-day problems that were caused by his bizarre behavior and the titlization in which the title to the property existed, the only thing she could do to accept this offer was to go forward and try to pay the bills as far as she could pay them and salvage what she could out of the property and correct the adverse cash position in which she found herself.

That she was able to do it starting with absolutely no money and no credit and no specific knowledge about what she was dealing with is an accomplishment of which we think any human being has the right to be justly proud. She did accept the offer. And the only way that it was susceptible to be accepted, and that is she assumed the responsibility for his liabilities and obligations, some of which involved recasting obligations on which he was very seriously involved both civilly and criminally, and she managed to salvage what I gather is an appreciable part of this estate, not all of it, but an appreciable part of it.

The court further discounted the appraisal evidence, finding that the value of the property was not "anything like these appraisals call for." [5]

---

**5.** This finding is important in view of appellant's argument that the value of the property when considered in light of the consideration

We are unable to say that the trial judge was clearly erroneous either in his findings of facts or the conclusions he drew from those facts. He correctly determined that there was a valid agreement affecting the ownership of the parties' property.

■ We hold that the trial judge was not clearly erroneous in determining that there was a valid agreement respecting the ownership of property which by its terms justified a finding of no marital property. In *Falise v. Falise*, 63 Md.App. 574, 493 A.2d 385 (1985), we faced a similar issue to that presented here. Mr. and Mrs. Falise separated pursuant to a separation agreement in which they mutually relinquished any and all right, title and interest in and to the other's property, then owned or thereafter acquired. Mr. Falise acquired land in his own name during the separation; he paid the downpayment partly with funds received pursuant to the separation agreement. When the parties reconciled, a house was built on the land and, the house, together with the land, was titled in both names as tenants by the entireties. Their subsequent separation resulted in divorce. The trial court found the separation agreement significant in determining whether the land acquired during the initial separation was marital property. We disagreed, observing:

> We doubt that the subsequent agreement could affect the status of something which is neither an interest in real or personal property, i.e., marital property. Marital property is merely a term created by the legislature to describe the status of property acquired during marriage, however titled, . . . title to which may have given rise to a potential inequity upon dissolution of the marriage. That inequity, conceptually, may be corrected via a different legislative creature called the "monetary award." Thus, the only function of "marital property" is to form a base for a "monetary award." The legislature never intended that

---

appellee was required to give for it renders the agreement "unjust and inequitable".

either spouse could have a legal *interest* in the "marital property" of the other since it merely intended to cure the title created inequity through the issuance of a "monetary award." (emphasis in original).

*Id.* 63 Md.App. at 580, 493 A.2d 385. We held:

> In order to exclude property "by valid agreement" from the reach of a monetary award, we believe that the parties must specifically provide that the subject property must be considered "non-marital" or in some other terms specifically exclude the property from the scope of the Marital Property Act.

*Id.* at 581, 493 A.2d 385.

Unlike the parties in *Falise*, who, by a bilateral agreement, relinquished all right, title and interest in and to each other's property (known and unknown, then owned or thereafter acquired), Julian Carsey made a unilateral offer to Nancy Carsey whereby "all properties assigned jointly or under my name singularly are Nancy S. Carsey's privilege to dispose of as she wishes" if she undertook "responsibility for liabilities related to that estate." The trial judge found, and we agree, that Nancy, through her conduct, accepted the unilateral offer; ergo, a valid agreement. That valid agreement specifically authorized Nancy to dispose of the property as she pleased, thus manifesting a clear intent, albeit "in some other terms specifically [to] exclude the property from the scope of the Marital Property Act." [6] Furthermore, in *Falise*, unlike here, the property sought to be excluded by the agreement was property acquired by the husband during the parties' separation pursuant to the agreement.

Here, the trial court in effect found as a fact, and justifiably so, that the note and the tape transcript, when

---

6. In this regard, we note: "It is presumed that parties contract with a knowledge of the existing laws ... and such law becomes a part of the contract unless expressly rejected as inapplicable." *Shell Oil v. Ryckman,* 43 Md.App. 1, 8, 403 A.2d 379 (1979). *See also Cabana, Inc. v. Eastern Air Control,* 61 Md.App. 609, 487 A.2d 1209 (1985).

viewed in light of appellant's actions, evinced appellant's clear intent to be rid of the liabilities of marriage as well as the benefits; in short, appellant intended to completely sever any and all connections, present and future, he had with his marriage, i.e., to chuck it all for now, henceforth, and forevermore. Supplementing his words, appellant's conduct also reflected that he was offering to give up his marital rights to be free of his marital obligations, just as he was willing to give up property rights to be free of his debts. The supportive evidence is ample. The note and the transcript speak with unmistakable clarity. And appellant's actions provide the exclamation point: he was fully aware of the parties' assets; his leaving was volitional, not coerced; aside from leaving without a hint of warning, so far as the record reveals, during the more than two years from departure to the filing of his answer to appellee's divorce action and his counter-bill for divorce, he never communicated with appellee; and, even more to the point, he neither inquired nor evidenced any concern about the property he now claims to be marital property. Furthermore, appellant himself testified that before leaving, among other things, he decided his marriage was over and should be dissolved and, having made that decision, he left. Given these facts, we are unable to say that the trial court's finding was erroneous, much less clearly so.

## II.

■ Appellant also argues that the trial judge, by "order[ing] the trustees of the property to take all necessary steps to vest title in Mrs. Carsey", improperly transferred ownership of personal or real property from one party to the other in contravention of Md.Family Law Code Ann. § 8-202(a)(3). We disagree. Having determined that appellee was the owner of all of the property by virtue of the agreement, it was perfectly proper and, indeed necessary, that title to the property be transferred so as to merge the legal title with the equitable title. This action was not

taken pursuant to the Marital Property Act; it is inherent in the authority of a court of equity.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.